William W. Wood, 3rd v. Commissioner.
Wood v. Commissioner
Docket No. 109007.
United States Tax Court
1943 Tax Ct. Memo LEXIS 50; 2 T.C.M. (CCH) 1010; T.C.M. (RIA) 43488; November 23, 1943
*50 The sale by petitioner to a company in which he was chief stockholder of part of his stock, held, to have been made at such times and in such manner as to make the transaction essentially equivalent to the distribution of a taxable dividend. Sterling Newell, Esq., and William A. Southworth, Esq., 1857 Union Commerce Bldg., Cleveland, O., for the petitioner. John H. Pigg, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioner's income tax for the years 1938 and 1939 in the respective amounts of $2,115.32 and $37,171.35. The entire deficiencies are contested. The single issue presented is whether the respondent erred in treating the respective redemptions in 1938 and 1939 of 42 and 200 shares of stock held by the petitioner, as redemptions essentially equivalent to distributions of taxable dividends, pursuant to section 115 (g) of the Revenue Act of 1938. Findings of Fact Part of the facts were stipulated and as so stipulated are adopted as findings of fact. The facts hereinafter appearing which were not stipulated are found from the evidence adduced at the hearing. In so far as material to the issue, *51 the facts are as follows: The petitioner, a resident of Piqua, Ohio, filed his income tax returns for the years here involved with the collector of internal revenue for the first Ohio district at Cincinnati, Ohio. During the years here involved the petitioner was the president and a director of The Wood Shovel and Tool Company, hereinafter called the company, having its principal offices at Piqua, Ohio. The Company is an Ohio corporation and was organized on May 31, 1902. It is engaged in the manufacture and sale of steel shovels, scoops and tools. The original authorized stock consisted of 600 shares of common stock with a par value of $100 per share. Between 1903 and 1922, 492 shares of that stock were issued for cash. On December 27, 1922 the authorized capital stock was increased to 5,000 shares of common having a par value of $100 per share. On December 30, 1922, 4,428 additional shares of common stock were issued as a 900 per cent stock dividend. Again on April 14, 1925 the authorized capital stock was increased by the authorization of 3,000 shares of 7 per cent cumulative preferred stock with a par value of $100 per share. On May 25, 1925, 1,000 shares of preferred stock *52 were issued to Edith G. Platt and Fred S. Gould in exchange for 1,000 shares of common stock owned by them. Subsequently, on February 26, 1932, the petitioner purchased the said 1,000 shares of preferred stock, and on June 30, 1935 he transferred those shares to the company. Since then those preferred shares have been carried by the company as treasury stock. No stock dividend has been declared or paid by the company since 1922. The following tables show the petitioner's acquisitions and disposals of common stock of the company from March 1, 1913 to December 31, 1939: ACQUISITIONS
Number
Cost basis
Date
How acquired
of shares
per share
3/ 1/13
Purchased prior to 3/1/13
60
10/ 8/14
Purchased
20
$500.00
8/ 7/17
Purchased
15
500.00
12/30/22
900% stock dividend
855
9/23/23
Through inheritance
1,900
90.00
4/14/25
Purchased
128
150.00
4/14/25
Purchased
95
150.00
7/ 3/25
Purchased
223
150.00
7/ 3/26
Purchased
224
150.00
1/ 5/27
Purchased
280
150.00
Total on hand 12/31/29
3,800
Less: Qualifying shares to George A. Paine,
B. B. Wood and W. B. Wood
3
Balance
3,797
DISPOSALS
Number
Cost basis
Year
How disposed
of shares
per share
1930
Surrendered to company
400
$ 76.90
1931
Surrendered to company
400
46 at 76.90
35 at 50.00
319 at 150.00
1932
Surrendered to company
400
154 at 76.90
246 at 50.00
1933
to
1937
incl. Transferred to W. B. Wood
11
1938
Surrendered to company
42
150.00
1939
Surrendered to company
200
150.00
Total disposals
1,453
Total acquired
3,797
Total disposals
1,453
Balance on hand 12/31/39
2,344
*53 The following table shows the authorized, unissued treasury and outstanding common stock of the company at the close of the years 1937 to 1939, inclusive: 1937
1938
1939
Number of shares authorized
5,000
5,000
5,000
Less: Unissued shares
50
50
50
4,950
4,950
4,950
Treasury stock
2,200
2,242
2,442
Outstanding
2,750
2,708
2,508
The outstanding shares of the company at the close of the years 1937 to 1939, inclusive, were owned as follows: Shares Held
Name of Owner
1937
1938
1939
William W. Wood, 3rd
2,584
2,542
2,342
C. C. Proctor, officer ofThe Wood Shovel and Tool Co.
100
100
100
Alleen B. Wood, wife of Wm. W. Wood, 3rd
50
50
50
Wm. Boal Wood, son of Wm. W. Wood, 3rd
13
13
13
Britton B. Wood, son of Wm. W. Wood, 3rd
1
1
1
Qualifying shares (Wm. W. Wood, 3rd)
2
2
2
2,750
2,708
2,508
Since 1926 the petitioner maintained an open account with the company. His periodic withdrawals were debited to it. From time to time the account was credited with part of his authorized salary, dividends on his company stock, miscellaneous items, and transfers to the company of shares of its stock and those of other corporations. *54 The larger portion of the credits from stock transfers resulted from surrenders of company shares. The account reflected an outstanding balance due from him to the company during the entire period from 1926 to December 31, 1939. The books of the company showed the following balances against the petitioner on December 31 of the respective years. Year
Balance
Balance
Debits
Credits
December 31
1925
$ 78,385.12
$ 78,385.12
1926
140,772.51
$100,384.45
118,773.18
1927
131,791.22
18,000.00
232,564.40
1928
143,097.75
67,076.00
308,586.15
1929
170,374.63
116,151.96
362,808.82
1930
180,276.45
(a) 138,459.96
404,625.31
1931
68,829.10
(b) 125,914.50
347,539.91
1932
44,774.05
(c) 126,558.00
265,755.96
1933
53,007.38
38,991.31
279,772.03
1934
68,380.93
60,504.50
287,648.46
1935
119,186.01
166,962.90
239,871.57
1936
178,698.89
150,001.19
268,569.27
1937
132,591.71
184,438.83
216,722.15
1938
138,707.35
(d) 169,203.83
186,225.67
1939
73,648.25
(e) 145,051.20
114,822.72
(a) Includes credit of $113,460 representing 400 shares surrendered (b) Includes credit of 106,912 representing 400 shares surrendered (c) includes credit of 99,408 *55 representing 400 shares surrendered (d) Includes credit of 15,204 representing 42 shares surrendered (Dec. 30, 1938) (e) Includes credit of 73,000 representing 200 shares surrendered (Dec. 28, 1939) (d) Includes also credit of $125,611.50 representing 13,749 shares of Cyclops transferred to company by petitioner on December 30, 1938. Note: On December 31, 1942 the balance of the account was $58.000, so reduced by the application of dividends and the proceeds of the sale of petitioner's assets to others. On December 31, 1937 the petitioner's indebtedness to the company was as follows: On open account
$216,722.15
Personal note bearing interest at
5%
160,000.00 During the year 1938 the petitioner's withdrawals from the company amounted to $138,707.35, and during the same year his open account on the company's books was credited with $169,203.83, representing: Salary
$ 21,666.66
Dividends, The Wood Shovel and
Tool Co.
2,586.00
Proceeds from 42 shares of common
stock of The Wood Shovel and Tool
Co. surrendered to company (Dec.
30, 1938)
15,204.00
Sales of 13,749 shares of stock of Uni-
versal-Cyclops Steel Corporation
125,611.50
Miscellaneous
4,135.67
Total
$169,203.83
*56 On December 31, 1938 the petitioner's indebtedness to the company was as follows: On open account
$186,225.67
Personal note bearing interest at
5%
$160,000.00 During the year 1939 the petitioner's withdrawals from the company amounted to $73,648.25. and during the same year his open account on the company's books was credited with $145,051.20, representing: Salary
$ 20,000.00
Dividends, The Wood Shovel and
Tool. Co
51,968.00
Proceeds from 200 shares of common
stock of The Wood Shovel and
Tool Co. surrendered to company
(Dec. 28, 1939)
73,000.00
Miscellaneous
83.20
Total
$145,051.20
The following table discloses the surplus account of the company for the years ended June 30, 1937 to June 30, 1939, inclusive: ADDITIONS TO SURPLUS
Surplus
Operating net
Other
Total net
Year
Balance
Profits after tax
Additions
Additions
6/30/37
$727,434.73
$126,816.99
$687.99
$127,504.98
6/30/38
689,796.20
6/30/39
616,936.24
3,024.66
3,024.66
DEDUCTIONS FROM SURPLUS
Excess over
Common Stock
Operating
par value
Miscel-
Total
Year
Dividends
Loss
stk. acq'd.
laneous
Deductions
6/30/37
$134,750.00
$ 1,274.80
$136,024.80
6/30/38
$2,065.69
35,612.84
37,638.53
6/30/39
8,166.00
$11,004.00
56,714.62
75,884.62
*57 In August, 1937 the company employed as its treasurer C. W. Parritt, a man of wide financial experience, including services as a state and Federal bank examiner. He was also elected to the board of directors and was responsible for the company's financial affairs. When Parritt initially examined the financial records of the company he was impressed with the size of the petitioner's personal account and considered it as having a detrimental effect on the company's credit standing. He knew that banks objected to large personal accounts of officers and stockholders. The existence of the account rendered it undesirable for the company to furnish financial statements to other business firms. Such failure on its part hampered its credit standing with those firms. On several occasions Parritt discussed these matters with the petitioner. In May 1938 Parritt, on behalf of the company, negotiated with General National Bank of Cleveland, hereinafter called Central, for an extension of credit. He was not only seeking immediate working capital but was also attempting to establish a long-time banking relationship. During the conference Central's officer criticized the existence of the petitioner's *58 account. Parritt concurred in the opinion and stated that he would seek to have the account eliminated. As a result of the above-mentioned negotiations, on June 13, 1938, Central agreed to extend the company a line of credit in the amount of $75,000 for a period of three years. The extension was conditioned on the company's maintaining a two-to-one ratio of current assets to current liabilities. The company was required to submit monthly financial statements to Central. If the current ratio were not maintained for three consecutive months, Central could terminate the credit. Outstanding loans would thereupon be callable on ten days' notice, provided, however, that the company could elect within the notice period to secure the loans by pledging accounts receivable aggregating at least 125 per cent of the outstanding indebtedness. If the accounts receivable were assigned, the debt was to be liquidated in six equal monthly installments. Soon after June 13, 1938 the company borrowed two sums totaling the entire amount of the available credit. During July, August, September and October of 1938 the company failed to maintain the required current ratio. In a letter dated December 1, 1938 *59 Central exercised its election to terminate the line of credit, and demanded payment of the outstanding loan within ten days. Central advised the company that it could assign accounts receivable in accordance with the previous understanding. On December 1, 1938 the balance of the loan was $62,500. The company's accounts receivable amounted to $58,000. Upon receiving Central's letter of December 1, 1939, Parritt, on behalf of the company, asked the petitioner to pay his account with the company. At that time the petitioner owned the following assets: 13,749 shares of Universal-Cyclops Steel Corporation common stock, hereinafter referred to as Cyclops; 2,586 shares of the company's common stock; a one-half interest in a residence in Florida; a collection of rare early American glassware; 65 shares of stock of Piqua National Bank and Trust Company; and three shares of the capital stock of American Fork & Hoe Company. The petitioner promised to transfer his assets to the company in order to liquidate his account. Accordingly, he agreed to turn over his 13,749 shares of Cyclops stock, having a value of $13.50 per share as listed on the New York Stock Exchange. At that time all but 49 *60 of the 13,749 shares of Cyclops stock were pledged to Central to secure the payment of a personal loan of $60,000 of the petitioner, payable to that bank. The petitioner also agreed to transfer 42 shares of the company's stock for $362.00 per share, its book value. On December 20, 1938, Parritt, on behalf of the company, wrote a letter to Central stating that the company could refinance its loan of $62,500 or could reduce it sufficiently so that the balance could be secured by assigning the accounts receivable but that the company preferred not to reduce the principal of the loan. At that time the company owed Central an additional sum of $124,910.34 which was secured by life insurance policies. Parritt reiterated the fact that the petitioner was indebted to the company in excess of $500,000 and that he intended to satisfy a part of the obligation by transferring his Cyclops stock to it. Parritt then submitted the following plan: The company would assume the petitioner's $60,000 indebtedness to Central which was to be secured by 13,700 shares of Cyclops. The loan then bearing interest at 3 1/2 per cent per annum was to be reduced to 3 per cent. Those shares, together with 49 additional *61 shares, were to be held by Central as collateral for an indebtedness of $122,500 ($60,000 representing the petitioner's indebtedness to be assumed by the company and $62,500 representing the balance on the loans extended on the line of credit). The company preferred that the two loans be considered as distinct obligations because the loan on the line had been made for working capital purposes and without collateral. The company was to have a right to sell 4,000 shares of Cyclops at $15 per share and to use the proceeds to reduce its indebtedness by $60,000. The other shares of Cyclops were to remain as security for the $62,500 obligation. If and when the company's debt, other than that secured by insurance policies, did not exceed $62,500 and its current ratio of assets to liabilities was not then less than two-to-one, the company in that event was to have the right to withdraw part or all the collateral securing the $62,500 indebtedness. The company retained the privilege to sell the Cyclops stock, provided the entire proceeds were applied to the secured debt, or to make other payments at any time. Central accepted the proposal. On December 29, 1938 the board of directors of the *62 company accepted the petitioner's offer to sell to it the 13,749 shares of Cyclops stock at $13.50 a share and 42 shares of the company's stock at $362 a share, its book value. The company in return agreed to assume the petitioner's $60,000 indebtedness to Central and to credit his open account with the balance of $140,815.50. On December 30, 1938 the petitioner transferred such Cyclops and company shares to the company. The $62,500 obligation was reduced to a short-term promissory note. Central made no commitment to extend the note beyond its due date. At a meeting of the board of directors held on December 28, 1939 the petitioner offered to sell to the company 200 additional shares of its stock for $365 per share, the book value, in return for a credit on his personal account of $73,000. The proposition was accepted by the board and the transfers were made. The 242 shares of the company's stock surrendered by the petitioner in 1938 and 1939 were not retired but were held as treasury stock. All those shares had been purchased by the petitioner on January 5, 1927 at a cost of $150 per share. All credits to the account subsequent to December 31, 1939 resulted from dividends on company *63 stock and salary returned by the petitioner or from his liquidation of other assets. No other shares of company stock were surrendered to the company from December 31, 1939 to the day of the hearing. Both the treasurer of the company and petitioner were conscious of the tax advantage to the petitioner of carrying out the transactions in the form of sales. The matter of tax saving was discussed and considered. The fact that if a dividend were paid the tax on petitioner would be so large that it would have been necessary for petitioner to draw heavily on the company to obtain funds with which to pay the tax, thereby depleting the cash position of the company, caused the abandonment of the thought of paying a dividend. Tax saving was one of the principal considerations that dictated the adoption of the procedure followed. The Commissioner held that the sums of $15,204 and $73,000 credited to the petitioner by the company in the years 1938 and 1939 in connection with its acquisition of the 42 and 200 shares, respectively, of its own common stock from him constituted taxable income to the petitioner "within the purview of the Internal Revenue Statutes." The redemptions by the company *64 of 42 shares of its common stock in 1938 and of 200 shares in 1939 were made at such times and in such manner as to make the distributions and redemptions essentially equivalent to the distributions of taxable dividends. Opinion VAN FOSSAN, Judge: The issue presented by this case is essentially one of fact. . The courts have laid down no definite rule applicable to all cases involving the application of section 115 (g) of the several revenue acts. , certiorari denied, . The petitioner in his income tax returns for both years here involved reported the difference between the cost basis of the shares of company stock transferred ( $150 per share) and the agreed consideration therefor ( $362 per share for the 42 shares surrendered in 1938 and $365 per share for the 200 shares turned over in 1939) as longterm capital gain. The respondent determined that the entire consideration constituted ordinary income. In his brief the Commissioner relies on section 115 (g) of the Revenue Act of 1938 and I.R.C. and *65 contends that the stock was redeemed "at such time and in such manner as to make the distribution and * * * redemption in whole or in part essentially equivalent to the distribution of a taxable dividend." Petitioner strongly urges that a proper business motive underlay the transfers and that they bear no resemblance to the redemptions made taxable by the statute. The petitioner was heavily indebted to the corporation on a personal account, a condition that had existed for several years. The new treasurer of the company a former Federal bank examiner and a man of wide financial experience, was much disturbed by this fact, and in the interests of the company suggested to petitioner that his account should be reduced. In negotiating for a bank credit, his attention was again focused on this fact by the bank official and he promised to try to eliminate the account. The several steps outlined in the findings of fact followed. In 1938 petitioner transferred to the company 13,749 shares of Universal-Cyclops Steel Corporation stock worth $125,611.50, and 42 shares of company stock and his account was credited with a balance of $140,815.50. In 1939 he similarly transferred 200 shares of *66 company stock. It also appears on record that both the treasurer of the company and petitioner were fully conscious of the tax advantage to petitioner of carrying out the transaction in the form of a sale of stock and that they discussed this matter. Petitioner, on the witness stand, testified that tax saving was one of the two considerations that dictated the procedure followed; the other and, in his judgment, the controlling consideration being the financial advantage to the company of reducing his personal account. The Supreme Court has said that no criticism is to be leveled at the taxpayer who adopts means which the law permits to reduce his tax liability. Section 115 (g), however, was specifically aimed at tax avoidance. By this section Congress has indicated that transactions falling within its scope are beyond the pale of legal means of tax avoidance and thus the definition of what constitutes such legal means is pro tanto narrowed. The question posed by this case is whether the taxpayer comes within or without the statutory range. The cases are many in holding that circuitous approach to the distribution of profits is ineffective if the tax-avoidance motive be present *67 by admission or by necessary inference from the record. , affirmed ; , affirmed ; cf. , affirmed . The simple rule announced by the Circuit Court of Appeals for the Second Circuit in , i.e., that if the redeemed shares had been issued bona fide, section 115 (g) never applied, has never been accepted by this Court or other Circuit Courts of Appeal. ; ;; . In the last cited case the test was said to be: "the net effect of the distribution rather than the motives or plans of the taxpayer or his corporation." The Flanagan case has been cited *68 by us as authority in numerous cases. ; ; ;; . The Seventh Circuit Court of Appeals in , in affirming , said: "Neither artifice, subterfuge, nor bad faith need be present to bring a transaction within the meaning of the statute." The Circuit Court of Appeals for the District of Columbia in the Flanagan case observed that, "The phrases 'in such manner' and 'essentially equivalent' negative any idea that a weighted formula can resolve the one crucial issue - shall the distribution be treated as a taxable dividend." It proceeded to hold that "the net effect of the distribution rather than the motives and plans of the taxpayer or his corporation is the fundamental question in administering section 115 (g)." The Circuit Court of Appeals for the Third Circuit *69 quoted this last statement as the basic criterion in determining the question presented. To the same effect see The practical effect of the gradual evolution of thought in the interpretation of section 115 (g) is cumulative. In the instant case we have a composite picture. As above noted, petitioner was fully conscious of the benefit in tax saving and admitted that the tax features of the case constituted one consideration for the adoption of the procedure followed. Petitioner insists, however, that the primary consideration was the liquidation of his account in order to improve the financial standing of the company. He testified that if they had paid a dividend the tax on the dividend, together with the tax on petitioner's salary, would have been so large that when he drew money from the company to pay it, not having the funds, it would have seriously affected the cash position of the company. This solicitude for the company's cash position does not appeal to us as minimizing the fact that tax saving was one of the principal reasons for the method of procedure adopted. Petitioner's case is the weaker by reason of this *70 explanation. We believe that the fact that tax avoidance was a principal consideration is alone sufficient to require a decision against petitioner. The other phase of the picture is the net result. Since petitioner was practically the sole owner of the corporation the change in percentage holdings brought about by the transfer was inconsequential. Nor did it materially alter the ratio of current assets to current liabilities. The company had a large surplus at all times. This distribution gave to the petitioner a portion of those accumulated earnings. There was no liquidation or contraction of the company in process. It may be added that the improvement in the company's financial position was not impressive. Petitioner continued to draw large sums during both of the years despite his claimed desire to liquidate his account. Petitioner pointed to , and , as controlling. We do not so regard them. Though similar in some respects they differ in others. In them we had no suggestion of tax avoidance, present here. In the Allen case no earnings were distributed *71 while in the Creech case the proportional holdings were changed substantially. There are other differences, and, moreover, as observed in , most of the cases arising under section 115 (g) "are of little value in the determination of the question instantly presented for the reason that each depends for its solution upon its own particular facts." We are of the opinion that the facts in this case require a holding that the redemptions by the company of 42 shares of its common stock in 1938 and of 200 shares in 1939 were made at such time and in such manner as to make the distributions and redemptions essentially equivalent to distributions of taxable dividends. Decision will be entered for the respondent.